# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **NASRIN AKHTAR SHEIKH, et al.,** | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 14-2090 (JDB)** |
| **REPUBLIC OF THE SUDAN, et al.,** | |
| **Defendants.** | |
| **GEOFFREY GITHUI KINYUA, et al.,** | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 14-2118 (JDB)** |
| **REPUBLIC OF THE SUDAN, et al.,** | |
| **Defendants.** | |

## MEMORANDUM OPINION

The statute of limitations applicable to suits brought under the so-called "terrorism exception" of the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A, is generous to plaintiffs. Indeed, just yesterday this Court concluded that a suit arising from the 1998 bombings of the U.S. embassies in Kenya and Tanzania was timely even though not filed until 2012. Owens v. Republic of Sudan, No. 01-cv-2244, 2016 U.S. Dist. LEXIS 37467, at *57–64 (D.D.C. Mar. 23, 2016). But that generosity is not boundless. Plaintiffs here also seek damages stemming from one of those 1998 bombings, but did not file suit until December 2014. The Court concludes that plaintiffs' claims against the Republic of Sudan are untimely under each of the two theories they propose, and it will therefore dismiss those claims with prejudice.

## BACKGROUND

On August 7, 1998, a pair of truck bombs detonated outside the U.S. embassies in Nairobi, Kenya, and Dar es Salaam, Tanzania, killing more than 200 people and injuring thousands. Starting in 2001, various groups of plaintiffs began to sue Sudan, alleging that it had provided material support to the al Qaeda terrorists who had carried out the attacks. (They also sued Iran, but that aspect of the litigation is largely irrelevant.) The Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. § 1602 et seq., generally bars suits against foreign states, but the victims were able to proceed under the so-called "terrorism exception" to foreign sovereign immunity, then codified at 28 U.S.C. § 1605(a)(7). That provision eliminated immunity, and by the same token created subject-matter jurisdiction, in cases seeking damages against designated state sponsors of terrorism for (among other actions) the provision of "material support or resources" for acts of "extrajudicial killing." 28 U.S.C. § 1605(a)(7) (2006).

The long and complicated history of those earlier cases, which the Court will refer to collectively as the "Owens cases," does not bear recounting in full here. But a short version will be useful. After initially defending in the first of the Owens cases, Sudan defaulted. The FSIA does not permit a default judgment against a foreign state unless a plaintiff provides satisfactory evidence of her right to recover, 28 U.S.C. § 1608(e), so the Court held an ex parte hearing at which the Owens plaintiffs submitted various forms of evidence bearing on Sudan's support for al Qaeda and the embassy bombings. The Court ultimately concluded that Sudan was not immune from suit and was liable to the victims of the bombings. Owens v. Republic of Sudan, 826 F. Supp. 2d 128 (D.D.C. 2011). The Court then referred the Owens cases to a number of special masters, who spent the next several years assessing what damages each of the hundreds of individual plaintiffs should be awarded.

In the midst of the long history of the <u>Owens</u> cases, Congress significantly amended the FSIA's terrorism exception. In the National Defense Authorization Act (NDAA) of 2008, Congress deleted § 1605(a)(7) and enacted an entirely new section, § 1605A. Pub. L. No. 110-181, § 1083, 122 Stat. 3, 338–44 (2008). Although the immunity exception contained in § 1605A was virtually identical to its predecessor in many respects, it did expand the class of potential plaintiffs. Under the old version, either the "victim" or "claimant" had to have been a U.S. national at the time of the incident giving rise to the claim. 28 U.S.C. § 1605(a)(7)(B)(ii) (2006). Under the new version, either the "victim" or "claimant" had to have been <u>either</u> a U.S. national, <u>or</u> a member of the U.S. armed forces, <u>or</u> a U.S. government employee (or contractor) acting within the scope of his employment at the time of the incident. 28 U.S.C. § 1605A(a)(2)(A)(ii). The expanded range of possible plaintiffs had a major impact on the <u>Owens</u> cases. This Court concluded that, under § 1605A, not only could foreign nationals directly injured while working at the embassies sue, but their foreign-national family members could also sue for emotional harm resulting from the direct victims' injuries and deaths. <u>See, e.g.</u>, <u>Amduso v. Republic of Sudan</u>, 61 F. Supp. 3d 42, 47–48 (D.D.C. 2014).

Between March and October 2014, this Court entered final judgments in all seven of the <u>Owens</u> cases, awarding a total of over $10 billion in compensatory and punitive damages. The entry of those judgments was apparently a wake-up call to Sudan, which after years of sitting on the sidelines finally decided to participate. Some months after filing notices of appeal in all of the <u>Owens</u> cases, Sudan asked this Court to vacate the judgments pursuant to Federal Rule of Civil Procedure 60(b). The appeals were put on hold while this Court addressed the host of arguments Sudan raised in its Rule 60(b) motions. And yesterday the Court denied those motions in full.

Owens, 2016 U.S. Dist. LEXIS 37467, at *120.  The fate of the Owens cases now rests with the D.C. Circuit.

We come at last to the two cases now before the Court, both of which take much the same form as the Owens cases, but which were not filed until December 2014.  According to the allegations in the complaints, which the Court for now assumes are true, Farhat Mahmood Sheikh and Moses Magothe Kinyua were victims of the Nairobi embassy bombing.  Sheikh was a British citizen who worked for the U.S. government (in what capacity is not clear) and was killed in the blast.  Compl. [Sheikh ECF No. 1] ¶ 9; Pls.' Opp'n to Mot. to Dismiss [Sheikh ECF No. 24] at 13.  Sheikh's estate, joined by his widow and children (also British citizens), alleges that Sudan and Iran were responsible for the bombing and are liable for Sheikh's death, his family's emotional distress, and their loss of Sheikh's society.  Compl. ¶¶ 9–17, 80–85.  Kinyua was a Kenyan citizen who worked for the U.S. government (in what capacity is again not clear) and who was severely injured in the blast.  Compl. [Kinyua ECF No. 1] ¶ 9; Pls.' Opp'n to Mot. to Dismiss [Kinyua ECF No. 23] at 1 & n.1.  Kinyua's brothers, sisters, and informally adopted son (all Kenyan citizens) allege that Sudan and Iran were responsible for the bombing and are liable for their emotional distress and loss of Kinyua's society.  Compl. ¶¶ 9–19, 74–77.  For convenience's sake, the Court will collectively refer to plaintiffs in both cases as "the Families."

As noted, by the time the Families filed these cases in late 2014, Sudan had begun participating in the various FSIA suits against it.  (Iran, by contrast, has never appeared in any of the cases arising out of these bombings, including these two.)  After learning of these newest suits, Sudan moved to dismiss them both.  Those motions are now fully briefed and ripe for joint decision, the issues in both cases being effectively identical.

### DISCUSSION

Sudan's motions raise a host of arguments, some claiming that the Court lacks subject-matter jurisdiction, others claiming that even if jurisdiction is proper the Families have failed to state claims on which relief can be granted.  Although a number of the arguments are identical to those the Court just rejected in the Owens cases, that decision does not resolve them all.  The Court concludes, however, that it need only address one argument: Sudan's contention that these suits are untimely.  Because the Court ultimately agrees with Sudan on that point, which is sufficient reason to dismiss, it need not address the remainder of Sudan's arguments.

Is it proper, though, for the Court to dismiss on timeliness grounds when Sudan has raised arguments going to subject-matter jurisdiction?  Cf. Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 93–102 (1998) (rejecting the notion that federal courts can assume subject-matter jurisdiction for the purpose of deciding the merits).  Sudan thinks yes, because Sudan thinks the relevant statute of limitations, 28 U.S.C. § 1605A(b), is itself a jurisdictional limit.  But the Court just decided in Owens that it is not jurisdictional.  Owens, 2016 U.S. Dist. LEXIS 37467, at *54–57.  No matter.  The D.C. Circuit has made clear that in FSIA cases a court may "properly move[] the timeliness issue to the head of the line," addressing it before issues of statutory subject-matter jurisdiction.  Chalabi v. Hashemite Kingdom of Jordan, 543 F.3d 725, 728 (D.C. Cir. 2008); see id. at 729 (dubbing this the "sensible course").  We move on, then, to the timeliness question itself.

The statute of limitations for claims brought under the terrorism exception to foreign sovereign immunity is found in § 1605A(b).  That provision reads, in relevant part:

> An action may be brought or maintained under this section if the action is commenced, or a related action was commenced under section 1605(a)(7) (before the date of the enactment of this section) . . . not later than the latter of—
>
> **(1)** 10 years after April 24, 1996; or
> **(2)** 10 years after the date on which the cause of action arose.

28 U.S.C. § 1605A(b). Thus, an action is timely if either the action itself is timely or a "related action" was timely. The Court will examine each of these two possibilities in turn.

### A.  These Actions Were Not Themselves Timely

To be timely in their own right, these actions must have been commenced not later than either (1) "10 years after April 24, 1996," or (2) "10 years after the date on which the cause of action arose." Commenced in December 2014, they clearly do not satisfy the first option. What about the second? Sudan says no: the Families' "cause of action arose" on the date of the bombing, August 7, 1998, and their actions were not filed until more than 16 years later. The Families disagree: in their view, their cause of action did not arise until 2008, when § 1605A was enacted. That is so, they argue, because until the enactment of § 1605A, the FSIA rendered Sudan immune from claims by foreign nationals such as the Families. Hence, the question before the Court is whether the Families' "cause of action arose" at the time of the bombing or instead at the time they were first able to sue in American courts.

The Court has found little precedent that bears directly on the question. The Supreme Court has said that "the standard rule [is] that the limitations period commences when the plaintiff has a complete and present cause of action," and that normally "a cause of action does not become 'complete and present' for limitations purposes until the plaintiff can file suit and obtain relief." Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of Cal., 522 U.S. 192, 201 (1997) (internal quotation marks omitted). This rule might at first sound quite helpful to the Families (though they do not actually cite it), but it is not clear that it applies here. Bay Area Laundry did not address issues of immunity or lack of subject-matter jurisdiction. Instead, it relied on the quoted rule to reject the argument that a certain statute of limitations began to run before an employer actually failed to make required debt payments. That was not correct, the Supreme Court

said, because any suit instituted before actual default "would be premature."  Id. at 202.  The

defendant's actual default was the final wrongful conduct necessary to make a suit against it ripe,

so it was on that date that the statute of limitations commenced.  Id.; see also Rawlings v. Ray, 312

U.S. 96, 98 (1941) (statute of limitations did not begin to run until date respondent's payment was

due, since "prior thereto suit could not be maintained against him").

     Bay Area Laundry thus seems to stand for the proposition that statutes of limitations

generally do not begin to run until a defendant has taken the final step that makes its conduct

legally actionable.  That is what the Court meant by "until the plaintiff can file suit and obtain

relief."  522 U.S. at 201; see also Petrella v. Metro-Goldwyn-Mayer, Inc., 134 S. Ct. 1962, 1969

(2014) (using the phrase likewise).  And thus Bay Area Laundry does little to help the Families,

for if Sudan engaged in tortious conduct toward them, that conduct occurred not later than August

7, 1998, the date on which they suffered their injuries.  A suit by the Families against Sudan filed

on August 8, 1998, would not have been "premature" in the sense Bay Area Laundry meant; rather,

it would have been barred by Sudan's statutory immunity, a subject not addressed by Bay Area

Laundry or (as far as the Court can tell) any other Supreme Court decision about statutes of

limitations.

     Sudan points to more apposite, though still not controlling, precedent.  In Vine v. Republic

of Iraq, 459 F. Supp. 2d 10 (D.D.C. 2006), the court addressed whether claims of hostage taking

brought under § 1605(a)(7) were timely under the then-applicable statute of limitations, § 1605(f).

In concluding that the claims were untimely, the court rejected the argument (which parallels the

Families' argument) that the victims' cause of action did not arise until the enactment of

§ 1605(a)(7) in 1996:

> This argument . . . confuses what it means for a cause of action to "arise"
> and what it means for a cause of action to "accrue," a distinction important

> to this case.   A claim "arises" on the date that the action in question
> occurred, yet does not "accrue" until a prior disability to suit is removed.
> Given this distinction, plaintiffs' argument that the statute of limitations did
> not begin to run until 1996 must be rejected, for, according to [the] FSIA,
> the statute of limitations began when their cause of action "arose," i.e., when
> the action in question occurred.

459 F. Supp. 2d at 21 (citations omitted).   On appeal, the D.C. Circuit reversed the untimeliness

holding on different grounds, and therefore did not address this issue.   Simon v. Republic of Iraq,

529 F.3d 1187, 1194–95 (D.C. Cir. 2008).   It did in passing, however, characterize the "argument

that [the plaintiffs'] claims did not arise until 1996" as "rather strained."   Id.   at 1195.   But the

D.C. Circuit's decision was then itself reversed by the Supreme Court on still other grounds.

Republic of Iraq v. Beaty, 556 U.S. 848 (2009); see also Simon v. Republic of Iraq, 330 F. App'x

3 (D.C. Cir. 2009) (vacating the D.C. Circuit's earlier judgment).

Vine's logic might be correct, but the Court is not certain of that.   Vine did not cite any

D.C. Circuit or Supreme Court precedent for the proposition that a cause of action " 'arises' on the

date that the action in question occurred."   459 F. Supp. 2d at 21.   Nor does it appear that either of

those courts has acknowledged a distinction between when a cause of action "arises" and when it

"accrues."   Bay Area Laundry seemed to treat the concepts interchangeably, applying "the

ordinarily applicable accrual rule," 522 U.S. at 195 (emphasis added), to a statute of limitations

that referred to " 'the date on which the cause of action arose,' " id. at 201 (emphasis added).   Of

course, it is possible the Supreme Court would recognize the distinction Vine relied on in a case

that squarely presented the issue, but this Court is leery of resting its conclusion on Vine's logic

alone.

In the end, it is the text and history of the FSIA itself that convince the Court that Sudan

has the better reading.   Specifically, it is the text of § 1605A(b)'s predecessor statute of limitations,

§ 1605(f).   That provision, enacted in 1996 along with § 1605(a)(7) (the original terrorism exception), provided:

> No action shall be maintained under [§ 1605(a)(7)] unless the action is commenced not later than 10 years after the date on which the cause of action arose.  All principles of equitable tolling, including the period during which the foreign state was immune from suit, shall apply in calculating this limitation period.

28 U.S.C. § 1605(f) (repealed 2008).   Under the Families' logic, "the date on which the cause of action arose" must have referred to the date in 1996 when § 1605(a)(7) was enacted, since that is the first moment plaintiffs were able to bring terrorism-related claims.   But that theory cannot be squared with the second sentence of § 1605(f), concerning equitable tolling.   That sentence instructs that the 10-year clock, which starts to run when "the cause of action ar[i]se[s]," is tolled for "the period during which the foreign state was immune from suit."   That period of immunity was necessarily <u>before</u> the 1996 enactment of § 1605(a)(7).   There would be no need to say that the clock was tolled during that pre-1996 period unless it was possible for a "cause of action" to have "arisen" during that time—despite the fact that any suit would have been barred.   Thus, Congress cannot have intended "the date on which the cause of action arose" to have meant the date of § 1605(a)(7)'s enactment; Congress clearly presumed that some causes of action had "arisen" earlier, back in "the period during which the foreign state was immune from suit."   At least in this FSIA context, then, when Congress referred to "the date on which the cause of action arose," it meant the date on which the injury was inflicted.   <u>Cf.</u> 51 Am. Jur. 2d <u>Limitation of Actions</u> § 130, Westlaw (database updated Feb. 2016) ("Generally, . . . when a wrong produces an injury, and when the injury is complete at the time of the act, the statutory limitations period commences to run at that time." (footnote omitted)).

To be clear, the <u>effect</u> of § 1605(f) was to give all plaintiffs with terrorism-related claims 10 years from the date of § 1605(a)(7)'s enactment to bring those claims.   <u>See</u> <u>Simon</u>, 529 F.3d at

1196; <u>Massie v. Gov't of Democratic People's Republic of Korea</u>, 592 F. Supp. 2d 57, 73 (D.D.C.

2008).  But that was not because (as the Families would argue) no "cause of action arose" until

that date.  It was because the second sentence of § 1605(f) tolled the clock (which otherwise would

have been running) for "the period during which the foreign state was immune from suit"—that

is, the period ending when § 1605(a)(7) was enacted in 1996.  <u>See</u> <u>Simon</u>, 529 F.3d at 1196 ("The

Congress first amended the FSIA to add a terrorism exception in 1996, before which Iraq was

'immune from suit'; hence the limitation period in § 1605(f) began to run in 1996 and expired in

2006.").  The key point here, again, is that the second sentence of § 1605(f) presupposed that

causes of action "arose" against foreign states even when they were immune, which must mean

they "arose" when the foreign state's conduct caused the injury underlying the claim.[1]

In the relevant portion of § 1605A(b), Congress once again required actions to be brought

within 10 years of "the date on which the cause of action arose."  28 U.S.C. § 1605A(b)(2).  There

is no reason to think that this phrase means something different in § 1605A(b) than what it meant

in § 1605(f).  Therefore, just as under § 1605(f), a cause of action "arises" for purposes of

§ 1605A(b) on the date a plaintiff is injured by the conduct underlying the claim.  But <u>unlike</u>

§ 1605(f), there is no second sentence in § 1605A(b) tolling the clock during the period of

immunity.  Thus, any cause of action the Families have against Sudan "arose" when the bombings

occurred on August 7, 1998, and the 10-year clock began to run immediately and was never tolled

---

[1] The same point can be inferred from the 1996 provision governing the retroactivity of the then-new terrorism exception to foreign sovereign immunity.  That provision said: "The amendments made by this subtitle [i.e., § 1605(a)(7) and related provisions] shall apply to any cause of action arising before, on, or after the date of the enactment of this Act."  Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 221(c), 110 Stat. 1214, 1243.  Here again Congress presumed that some causes of action had already "arisen," even before the relevant exception to immunity had been created.  The obvious inference is that Congress believed that causes of action cognizable under § 1605(a)(7) "arose" when the foreign state's wrongful conduct injured the plaintiff.

thereafter.  Because the Families did not file these actions by August 7, 2008, they were not timely

under § 1605A(b).

### B.   No "Related Action" Makes These Actions Timely

As noted earlier, a § 1605A action can either be timely in its own right or timely by virtue

of a "related action."  See 28 U.S.C. § 1605A(b).  The "related action" concept is elaborated in

§ 1083(c)(3) of the 2008 NDAA (the act that created § 1605A), which provides in relevant part:

> **Related actions. —** If an action arising out of an act or incident has been
> timely commenced under section 1605(a)(7) of title 28, United States Code,
> . . . any other action arising out of the same act or incident may be brought
> under section 1605A of title 28, United States Code, if the action is
> commenced not later than the latter of 60 days after—
> **(A)** the date of the entry of judgment in the original action; or
> **(B)** the date of the enactment of this Act [Jan. 28, 2008].

Pub. L. No. 110-181, § 1083(c)(3), 122 Stat. at 343 (codified at 28 U.S.C. § 1605A note).  In other

words, if an earlier ("original") action based on an incident was timely commenced under the old

version of the terrorism exception, a new action based on the same incident can be commenced

under the new version by March 28, 2008, or 60 days after judgment was entered in the original

action, whichever is later.

Because judgment in an original action might not be entered until long after the date of

§ 1605A's enactment, § 1083(c)(3) creates the possibility that some new actions that would have

been clearly untimely standing on their own are nonetheless timely by virtue of the existence of a

related original action.  For example, the Court recently held that actions arising from the embassy

bombings that were filed against Sudan in 2010 and 2012 were timely under § 1083(c)(3) because

judgment was not entered in the original Owens case until 2014.  Owens, 2016 U.S. Dist. LEXIS

37467, at *57–64.  The Families say the same is true of their actions here: their actions also "aris[e]

out of the same act or incident" as the original Owens case (which was "timely commenced under

section 1605(a)(7)" in 2001), and they were commenced within 60 days of the entry of judgment in Owens on October 24, 2014.

But as the Families concede in a footnote—a dangerous place to put an important point, see, e.g., CTS Corp. v. EPA, 759 F.3d 52, 64 (D.C. Cir. 2014)—the history of Owens and of the judgment entered on October 24, 2014, is not so simple.  Owens contained two distinct sets of plaintiffs.  In 2001 the original Owens plaintiffs brought a timely action against Sudan (and Iran) under § 1605(a)(7).[2]  In 2009 they converted their action to one brought under § 1605A.  In 2012 a new set of plaintiffs, the "Aliganga plaintiffs," moved to intervene.  The Court granted their motion on July 3, 2012, deeming their intervention timely by virtue of § 1083(c)(3) of the NDAA.  But although the Aliganga plaintiffs did thereby become Owens plaintiffs, the two sets of plaintiffs continued to be treated as distinct groups.  Most importantly, they were treated as distinct groups with respect to their judgments.  The Court entered judgment in favor of the original Owens plaintiffs on March 28, 2014, certifying that judgment as final pursuant to Federal Rule of Civil Procedure 54(b) on April 11, 2014.  The Court separately entered judgment in favor of the Aliganga plaintiffs on October 24, 2014.  Thus, although plaintiffs here filed their actions within 60 days of the entry of the Aliganga plaintiffs' judgment, they did not file within 60 days of the entry of the original Owens plaintiffs' judgment.

The Families think that was good enough.  They note that, as a general matter, an intervenor "is treated just as if it were an original party."  Schneider v. Dumbarton Developers, Inc., 767 F.2d 1007, 1017 (D.C. Cir. 1985).  Thus, they say, the Aliganga plaintiffs were full members of the Owens case, which qualifies as a related original action under § 1083(c)(3).  And therefore, they

---

[2] The original complaint, filed in October 2001, named James Owens as the sole plaintiff.  But the first amended complaint, filed in September 2002, named numerous co-plaintiffs.  It is that group the Court refers to as the "original Owens plaintiffs."

conclude, the entry of the Aliganga plaintiffs' judgment on October 24, 2014, started § 1083(c)(3)'s 60-day countdown for new actions, and the Families' suits filed in mid-December 2014 were timely.

The Court disagrees.  Section 1083(c)(3) demands that any new § 1605A action be filed within 60 days of the entry of the judgment that concluded the original action "timely commenced under section 1605(a)(7)."  To treat the Aliganga plaintiffs' judgment as fitting that bill stretches § 1083(c)(3) beyond reason.  The Aliganga plaintiffs never brought claims under § 1605(a)(7).  They did not become plaintiffs until long after the original Owens plaintiffs' claims under § 1605(a)(7) had dropped out of the case.  And, perhaps most importantly, the only reason the Aliganga plaintiffs' claims were themselves timely was by virtue of the operation of § 1083(c)(3).  The Families are thus trying to piggyback on plaintiffs who themselves piggybacked on others.  This acrobatic maneuver would clearly fail if the Aliganga plaintiffs had simply filed a separate lawsuit with its own case number.  The Court sees no reason why their decision to instead intervene should lead to a different result.  It is simply untenable to read "the entry of judgment in the original action" in § 1083(c)(3) as encompassing a judgment in favor of a group of plaintiffs—intervenors or otherwise—who first filed their claims in the year 2012, and under § 1605A, not § 1605(a)(7).  Hence, the Families' claims are not timely under § 1083(c)(3).

Because the Families' claims against Sudan are neither timely in their own right under § 1605A(b) nor timely by virtue of a related action under § 1083(c)(3), the Court will dismiss them with prejudice.

### C.  Plaintiffs' Claims Against Iran Remain—For Now

The Families have sued not only Sudan but also Iran, which has never appeared.  The Clerk entered defaults against Iran in October 2015, and the Families have since moved for the entry of

default judgments.  Based on the foregoing analysis, however, it would appear that the Families' claims against Iran are also untimely.  After all, their claims against Iran arise from the same bombing and were filed in this Court at the same time.  The Court therefore faces the question whether those claims should also be dismissed, even though Iran has not raised the statute of limitations—indeed, has not appeared at all.

It is normally inappropriate for a federal court to dismiss claims as untimely <u>sua sponte</u>. <u>Eriline Co. S.A. v. Johnson</u>, 440 F.3d 648, 656–57 (4th Cir. 2006).  The statute of limitations is an affirmative defense that a defendant normally forfeits if he does not raise it in his pleadings.  <u>Day v. McDonough</u>, 547 U.S. 198, 202 (2006); <u>see</u> Fed. R. Civ. P. 8(c)(1);   This rule is not ironclad, however.  The Supreme Court has held, for instance, "that district courts are permitted, but not obliged, to consider, <u>sua sponte</u>, the timeliness of a state prisoner's habeas petition."  <u>Id.</u> at 209. And a number of courts have approved the <u>sua sponte</u> consideration of timeliness in the context of motions for default judgment, especially when the untimeliness of the claims is readily apparent. <u>See, e.g.</u>, <u>Taiwan Civil Rights Litig. Org. v. Kuomintang Bus. Mgmt. Comm.</u>, 486 F. App'x 671, 671–72 (9th Cir. 2012) (per curiam); <u>De Santis v. City of New York</u>, 2014 WL 228659, at *5–6 (S.D.N.Y. Jan. 22, 2014); <u>Donell v. Keppers</u>, 835 F. Supp. 2d 871, 877 (S.D. Cal. 2011).

There would seem to be a strong case for permitting courts faced with a motion for default judgment under the FSIA to raise timeliness <u>sua sponte</u>.  "Comity in the face of an absent foreign sovereign," the Fourth Circuit has said, "presents a special circumstance permitting sua sponte consideration of a res judicata defense."  <u>Clodfelter v. Republic of Sudan</u>, 720 F.3d 199, 209 (4th Cir. 2013).  It would seem likewise to justify <u>sua sponte</u> consideration of a statute of limitations defense.  Such consideration is also of a piece with—if not necessarily compelled by—the FSIA's

prohibition on the entry of a default judgment "unless the claimant establishes his claim or right to relief by evidence satisfactory to the court."  28 U.S.C. § 1608(e).

But the Court will not decide today whether to dismiss the Families' claims against Iran. The Families have not yet had the chance to review the Court's analysis and to raise any argument on that score.  The Court will give them that opportunity before resolving their motions for default judgments.  Cf. Day, 547 U.S. at 210 ("Of course, before acting on its own initiative, a court must accord the parties fair notice and an opportunity to present their positions.").  They may not use that opportunity, however, to relitigate the Court's interpretation of § 1605A(b) and § 1083(c)(3), but rather only to argue that the Court's decision to dismiss the claims against Sudan should not lead it to likewise dismiss the claims against Iran.

## CONCLUSION

For the foregoing reasons, the Families' claims against Sudan will be dismissed with prejudice as untimely.  With respect to their claims against Iran, they will have the opportunity to supplement their motions for default judgment to argue that those claims should not also be dismissed as untimely.  A separate order to this effect will issue in each of these cases.

_____/s/_____
JOHN D. BATES
United States District Judge

Dated: March 24, 2016