## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **NASRIN AKHTAR SHEIKH, et al.,**<br><br>**Plaintiffs,**<br><br>v.<br><br>**REPUBLIC OF THE SUDAN, et al.,**<br><br>**Defendants.** | **Civil Action No. 14-2090 (JDB)** |
| **CALEB NDEDA CHOGO, et al.,**<br><br>**Plaintiffs,**<br><br>v.<br><br>**REPUBLIC OF THE SUDAN, et al.,**<br><br>**Defendants.** | **Civil Action No. 15-951 (JDB)** |
| **GARY LONNQUIST, et al.,**<br><br>**Plaintiffs,**<br><br>v.<br><br>**ISLAMIC REPUBLIC OF IRAN, et al.,**<br><br>**Defendants.** | **Civil Action No. 17-1630 (JDB)** |

## <u>MEMORANDUM OPINION</u>

Before the Court are three cases arising from the 1998 bombings of the U.S. Embassies in Nairobi, Kenya, and Dar es Salaam, Tanzania.  Plaintiffs are direct victims of these bombings, as well their immediate family members.  After several years of litigation, plaintiffs now move for default judgment jointly against the Islamic Republic of Iran and the Iranian Ministry of Information and Security (collectively, the "Iranian defendants").  For the reasons explained below, the Court will grant in part and deny in part plaintiffs' motions.

1

**Background**

The Court assumes familiarity with the facts of these cases as rehearsed in its prior opinions, see generally Sheikh v. Republic of Sudan, 308 F. Supp. 3d 46 (D.D.C. 2018); Sheikh v. Republic of Sudan, 172 F. Supp. 3d 124 (D.D.C. 2016), as well as with the broader litigation arising out of the August 7, 1998 bombing of the United States embassies in Nairobi, Kenya, and Dar es Salaam, Tanzania, see, e.g., Owens v. Republic of Sudan, 826 F. Supp. 2d 128, 135–46 (D.D.C. 2011). It will thus spell out here only those facts necessary to understand the present motions.

On August 7, 1998, al Qaeda terrorists detonated two truck bombs outside of the U.S. embassies in Nairobi and Dar es Salaam, killing hundreds of people and injuring over a thousand. See Sheikh, 172 F. Supp. 3d at 125. Since that time, victims, their estates, and their family members have filed cases in this District seeking compensation for these attacks under the "terrorism exception" in the FSIA, 28 U.S.C. § 1605A. These plaintiffs have alleged that Iran was liable for compensatory and punitive damages because it provided material support to al Qaeda in organizing and executing these attacks. In a series of prior rulings, the Court has agreed and has awarded damages against Iran and its agents for wrongful death, loss of solatium, battery, intentional infliction of emotional distress, and other forms of economic damages arising out of the embassy bombings. See, e.g., Order, Wamai v. Republic of Sudan, Civil Action No. 08-1349 (JDB) (D.D.C. July 25, 2014); Order, Mwila v. Islamic Republic of Iran, Civil Action No. 08-1377 (JDB) (D.D.C. Mar. 28, 2014); Order, Khaliq v. Republic of Sudan, Civil Action No. 10-356 (JDB) (D.D.C. Mar. 28, 2014).

In the present three cases as well, plaintiffs bring their claims under the FSIA. Plaintiffs in Sheikh and Chogo filed complaints on December 11, 2014, and June 19, 2015, respectively, against the Republic of the Sudan and the Ministry of the Interior of the Republic of the Sudan (collectively, "the Sudanese defendants") and against the Iranian defendants. Plaintiffs in Chogo are fifty-eight

Kenyan, Tanzanian, Rwandan, and U.S. citizens injured and killed in the bombings and their immediate family members, and plaintiffs in Sheikh are the Estate of Farhat Mahmood Sheikh, a British citizen who was killed in the Nairobi bombing, as well as four of his immediate family members.  They bring their claims under the federal cause of action in 28 U.S.C. § 1605A(c) and D.C. common law, Kenyan common law, and Tanzanian common law, claiming wrongful death, assault and battery, intentional infliction of emotional distress, aiding and abetting, civil conspiracy, and punitive damages.

The Sudanese defendants challenged plaintiffs' claims as untimely, and on March 24, 2016, the Court dismissed plaintiffs' claims against those defendants as outside the FSIA's statute of limitations.  See Mar. 24, 2016 Order [Sheikh ECF No. 29].  Iran, by contrast, never appeared in court—as has been its practice in all litigation that this Court is aware of stemming from the 1998 bombings.  Nevertheless, after receiving briefing on whether the statute of limitations should bar plaintiffs' claims against the Iranian defendants as well, the Court set aside the prior defaults and dismissed plaintiffs' remaining claims as untimely.  See Sheikh, 308 F. Supp. 3d at 55–56.  The D.C. Circuit reversed, holding that this Court "lack[ed] authority to sua sponte raise a forfeited statute of limitations defense in an FSIA terrorism exception case, at least where the defendant sovereign fails to appear."  Maalouf v. Islamic Republic of Iran, 923 F.3d 1095, 1101 (D.C. Cir. 2019).

On remand, and because Iran has still never entered an appearance in these cases, the Court now turns to the merits of plaintiffs' claims.  On August 29, 2019, the Court appointed Special Masters "to consider all issues relating to standing and compensating damages for each plaintiff's claims."  See Order Adopting Administrative Plan [Sheikh ECF No. 44] at 3; Order Adopting Administrative Plan [Chogo ECF No. 37] at 3; see also Order Appointing Special Masters [Sheikh ECF No. 45] at 2–3; Order Appointing Special Masters [Chogo ECF No. 38] at 2–3.  In light of the

Special Masters' reports, see, e.g., R. & R. of Special Master Deborah Greenspan Regarding Damages Claims Asserted by Pls. ("Sheikh Report") [Sheikh ECF No. 66] at 1; R. & R. of Special Master Regarding Plaintiffs Estate of Francis Kibe Njuguna's and John Kabi Kibe's Claims ("Njuguna Report") [Chogo ECF No. 77], plaintiffs filed a motion for default judgment against the Iranian defendants.  See Pls.' Consolidated Mot. for Entry of Default Js. on Liability & Damages ("Sheikh/Chogo Mot.") [Sheikh ECF No. 83] at 1; Pls' Consolidated Mot. for Entry of Default Js. [Chogo ECF No. 97] at 1.

Plaintiffs in Lonnquist are Gary Lonnquist and Timothy Teske, who were injured in the Nairobi bombing, as well as five other family members.  On August 15, 2017, they brought suit against only the Iranian defendants; relying on the federal cause of action in § 1605A(c), D.C. common law, and Virginia common law, the Lonnquist plaintiffs seek damages for personal injury resulting from assault and battery, pain and suffering, intentional infliction of emotional distress, loss of consortium, and punitive damages.  See Compl. [Lonnquist ECF No. 3] ¶¶ 23–48; see also Lonnquist Am. Compl. [Lonnquist ECF No. 41] at 23 (amending plaintiffs' original complaint with a request for prejudgment interest).

On November 27, 2018, the Court entered an order denying the Lonnquist plaintiffs' motion for entry of default judgment and, as in Sheikh and Chogo, dismissing the claims with prejudice as outside the FSIA's statute of limitations.  See Order on Mot. for Default J. [Lonnquist ECF No. 23] at 5.  Citing Maalouf, which had been issued in the interim, the D.C. Circuit reversed the dismissal and remanded the case to this Court for further proceedings.  See Order, Lonnquist v. Islamic Republic of Iran, No. 18-7180 (D.C. Cir. July 26, 2019).  On remand, the Court appointed Deborah Greenspan as Special Master "for the administration of the compensatory damages claims."  See Order Appointing Special Masters [Lonnquist ECF No. 36] at 2.  Based on her Report, see R. & R.

4

of Special Master Deborah Greenspan Regarding Compensatory Damages ("Lonnquist Report")
[Lonnquist ECF No. 38], plaintiffs filed a motion for default judgment against the Iranian defendants,
see Pls.' Mot. for Entry of Final Default J. on Liability & Damages ("Lonnquist Mot.") [Lonnquist
ECF No. 42].

## Legal Standard

The FSIA, 28 U.S.C. §§ 1602–11, provides the "sole basis for obtaining jurisdiction over a
foreign state in our courts." Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434
(1989). Although foreign states are presumptively immune from the jurisdiction of U.S. courts, see
Saudi Arabia v. Nelson, 507 U.S. 349, 355 (1993); see also 28 U.S.C. § 1604, the FSIA provides for
subject matter jurisdiction if the defendant's conduct falls within one of several specific statutory
exceptions, see 28 U.S.C. §§ 1330(a), 1604. Conversely, "if no exception applies, the district court
has no jurisdiction." Odhiambo v. Republic of Kenya, 764 F.3d 31, 34 (D.C. Cir. 2014). Plaintiffs
"bear[] the initial burden of supporting [their] claim that [an] FSIA exception applies," but this burden
is one only of production; ultimately, "the burden of persuasion rests with the sovereign claiming
immunity, which must establish the absence of the factual basis by a preponderance of the evidence."
Chevron Corp. v. Ecuador, 795 F.3d 200, 204 (D.C. Cir. 2015).

One such statutory exception, set forth in 28 U.S.C § 1605A, waives sovereign immunity in
cases concerning a "state sponsor of terrorism." That exception affords subject matter jurisdiction in
cases where "money damages are sought against a foreign state for personal injury or death that was
caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of
material support or resources for such an act" when such actions are taken "by an official, employee,
or agent of such foreign state while acting within the scope of his or her office, employment, or
agency." 28 U.S.C. § 1605A(a)(1).

Federal courts may exercise personal jurisdiction over a foreign state if the sovereign defendant is properly served in accordance with 28 U.S.C. § 1608.  Owens, 826 F. Supp. 2d at 148; see also 28 U.S.C. § 1330(b).  "Once jurisdiction has been established over plaintiffs' claims against all defendants, liability on those claims in a default judgment case is established by the same evidence if 'satisfactory to the Court.'"  Owens, 826 F. Supp. 2d at 151 (quoting 28 U.S.C § 1608(e)). Satisfactory evidence includes sworn affidavits or declarations, prior judicial fact-findings, and other documents submitted in accordance with the Federal Rules of Evidence.  See Bathiard v. Islamic Republic of Iran, Case No. 1:16-cv-1549 (CRC), 2019 WL 3412983, at *5 (D.D.C. July 29, 2019); Bodoff v. Islamic Republic of Iran, 424 F. Supp. 2d 74, 78 (D.D.C. 2006).  "Section 1608(e) does not require a court to step into the shoes of the defaulting party and pursue every possible evidentiary challenge; only where the court relies upon evidence that is both clearly inadmissible and essential to the outcome has it abused its discretion."  Owens v. Republic of Sudan, 864 F.3d 751, 785–86 (D.C. Cir. 2017).

## Analysis

### I.   Jurisdiction

The Court first turns to whether it has subject matter jurisdiction over this dispute and personal jurisdiction over the Iranian defendants.  The Court concludes that all three sets of plaintiffs have satisfactorily established both forms of jurisdiction.

Beginning with subject matter jurisdiction, plaintiffs have demonstrated by a preponderance of the evidence that Iran qualifies under the "state sponsor of terrorism" exception set forth in § 1605A.  In relevant part, the exception covers cases seeking damages "for personal injury or death that was caused by . . . the provision of material support or resources" for "extrajudicial killing," if such aid was provided by "an official, employee, or agent of [a] foreign state while acting within the

6

scope of his or her office." 28 U.S.C. § 1605A(a).  In order to come within the exception, the foreign state must have been "designated as a state sponsor of terrorism at the time" of the terrorist attack or "so designated as a result of [the] act" and remain so designated at the time of the lawsuit.  Id. § 1605A(a)(2)(A)(i)(I).  And the claimant or victim must also have been either a U.S. national, a member of the armed services, or "otherwise an employee of the Government of the United States" or a government contractor, at the time of the tortious act.  Id. § 1605A(a)(2)(A)(ii).

Plaintiffs in Sheikh, Chogo, and Lonnquist satisfy all three requirements.  First, "Iran was formally declared a 'state sponsor of terrorism' on January 19, 1984, by U.S. Secretary of State George P. Schultz . . . , and remains designated as a state sponsor of terrorism."  Estate of Doe v. Islamic Republic of Iran ("Doe I"), 808 F. Supp. 2d 1, 13–14 (D.D.C. 2011); see also U.S. Dep't of State, State Sponsors of Terrorism, https://www.state.gov/state-sponsors-of-terrorism/ (listing Iran as a state sponsor of terrorism) (last visited August 28, 2020).  Second, the Court takes judicial notice of and adopts the facts and conclusions of law set forth in its prior opinions concluding that the Iranian defendants provided "material support" to aid the 1998 embassy bombings.  See Owens, 826 F. Supp. 2d at 148–51.  Finally, plaintiffs satisfy the eligibility requirements of § 1605A(a)(2)(A)(ii) because, at the time of the attacks, all plaintiffs were either U.S. nationals, employees of the United States, "individual[s] performing a contract awarded by the United States Government," or the family members of such individuals.  See, e.g., Lonnquist Report at 1 (noting that all Lonnquist plaintiffs are U.S. citizens); Sheikh Report at 2 (explaining that all Sheikh plaintiffs bring their claims based on the wrongful death of Farhat Mahmood Sheikh, "a longtime foreign service national employee of the Embassy"); see also Sheikh Compl. ¶ 2 (identifying plaintiffs as eligible under § 1605A(a)(2)(A)(ii)); Chogo Compl. ¶ 2 (same); Lonnquist Am. Compl. ¶ 2 (same).

The Court also has personal jurisdiction over the Iranian defendants in all three cases.  "A

foreign state or its political subdivision, agency, or instrumentality must be served in accordance with 28 U.S.C. § 1608." Fed. R. Civ. P. 4(j)(1). Section 1608(a) sets forth four methods, in descending order of preference, for serving a foreign state, and plaintiffs must attempt service by each more preferred method, or conclude that such a method is impracticable, before proceeding to the next method. See Doe I, 808 F. Supp. 2d at 12. The first two methods are inapplicable in lawsuits against Iran because no "special arrangement for service" exists between the United States and Iran, 28 U.S.C. § 1608(a)(1), and Iran is not a party to any "international convention on service of judicial documents," id. § 1608(a)(2). Aceto v. Islamic Republic of Iran, No. CV 19-464 (BAH), 2020 WL 619925, at *14 (D.D.C. Feb. 7, 2020).

Given the futility of these first two methods, the Lonnquist plaintiffs attempted service by certified mail to "the head of [Iran's] ministry of foreign affairs," 28 U.S.C. § 1608(a)(3). See Certificate of Mailing [Lonnquist ECF No. 8] at 1. But that attempt was unsuccessful, and the Lonnquist plaintiffs then resorted to service "through diplomatic channels" in accordance with § 1608(a)(4). See Request for Service of Process [Lonnquist ECF No. 10] at 1–2. Service was completed via diplomatic channels on February 7, 2018. See Return of Service Aff. [Lonnquist ECF No. 16] at 1.

Plaintiffs in Sheikh and Chogo, by contrast, turned directly to service through diplomatic channels, see Request for Service of Process [Sheikh ECF No. 13] at 1; Request for Service of Process [Chogo ECF No. 8] at 1, citing the District Court's Attorney's Manual for Service of Process on a Foreign Defendant, which noted that "many attempts at service [on Iran] by mail or courier are unsuccessful" and thus it was "okay" to jump to service by diplomatic channels, Ex. 1, Request for Service of Process ("Attorney Manual") [Chogo ECF No. 8-1] at 2. The Chogo plaintiffs' complaint, summons, and notice of suit were delivered to the Iranian defendants on February 15, 2016, see

8

Return of Service Aff. [Chogo ECF No. 19] at 1, and the Sheikh's plaintiffs' documents were delivered on June 2, 2015, see Return of Service Aff. [Sheikh ECF No. 19] at 1.

The Court thus has subject matter jurisdiction and personal jurisdiction under the FSIA because the case falls within the "state sponsor of terrorism" exception of § 1605A and service on the defaulted Iranian defendants was proper.  And because Iran has still failed to appear, the Court accordingly reinstates the defaults that it previously set aside.  See Sheikh, 308 F. Supp. 3d at 48.

## II.    Iran's Liability for the 1998 Nairobi Embassy Bombing

The Court next turns to the Iranian defendants' liability for plaintiffs' injuries arising out of the attack on the U.S. Embassy in Nairobi on August 7, 1998.  In their complaints, plaintiffs allege various claims against the Iranian defendants under 28 U.S.C. § 1605A(c), and under U.S. state and foreign common law, including wrongful death, assault and battery, loss of consortium, intentional infliction of emotional distress, aiding and abetting, and civil conspiracy.  See Sheikh Compl. ¶¶ 70–93; Chogo Compl. ¶¶ 148–68; Lonnquist Am. Compl. ¶¶ 23–43.

Plaintiffs who were U.S. nationals or employees of the U.S. Government on August 7, 1998, may pursue their claims under the federal cause of action in § 1605A, which permits suit "for personal injury or death caused by . . . a foreign state's" tortious acts and affords recovery for "economic damages, solatium, pain and suffering, and punitive damages."  28 U.S.C. § 1605A(c).  Judges in this District have also concluded that victims of terrorism can bring claims for intentional infliction of emotional distress under § 1605A(c).  See, e.g., Reed v. Islamic Republic of Iran, 845 F. Supp. 2d 204, 212 (D.D.C. 2012) ("An act that would otherwise constitute [intentional infliction of emotional distress] gives rise to liability under the FSIA.").  Those few plaintiffs who are both non-U.S. citizens and were not employed by the U.S. Government on August 7, 1998, see Sheikh/Chogo Mot. at 5–6 (noting that Faraz Akhtar Sheikh's surviving spouse and children, none of whom worked for the U.S.

9

government, are all British citizens); <u>id.</u> at 21–31 (noting various non-U.S. citizen, non-employee immediate family members), do not have a federal cause of action because they do not fall into the categories specified in § 1605A(c).  <u>See</u> <u>Owens</u>, 826 F. Supp. 2d at 152–53; <u>Doe I</u>, 808 F. Supp. 2d at 18.  Nevertheless, they may pursue their claims under applicable state and/or foreign law.  <u>See</u> <u>Owens</u>, 826 F. Supp. 2d at 153–57; <u>Doe I</u>, 808 F. Supp. 2d at 19–20.  Here, these plaintiffs pursue their claims under D.C. law.  <u>See</u> <u>Lonnquist</u> Mot. at 4; <u>Sheikh</u>/<u>Chogo</u> Mot. at 21–31.

Whether plaintiffs are proceeding under § 1605A(c) or a state-law cause of action, the FSIA does not provide the substantive basis for plaintiffs' claims.  <u>See</u> <u>Estate of Hirshfeld v. Islamic Republic of Iran</u>, 330 F. Supp. 3d 107, 137–38 (D.D.C. 2018).  Instead, plaintiffs must "rely on well-established principles of law, such as those found in Restatement (Second) of Torts and other leading treatises, as well as those principles that have been adopted by the majority of state jurisdictions to outline the boundaries of [their] theories of recovery."  <u>Oveissi v. Islamic Republic of Iran</u> ("<u>Oveissi II</u>"), 879 F. Supp. 2d 44, 54 (D.D.C. 2012) (internal quotation marks omitted).  The Court thus evaluates each of plaintiffs' claims under such "well-established principles of law."  <u>Id.</u>

"[L]iability in a default judgment case is established by the same evidence [used to establish jurisdiction] if 'satisfactory to the [c]ourt.'"  <u>Doe I</u>, 808 F. Supp. 2d at 17–18 (quoting 28 U.S.C. § 1608(e)).  The "satisfactory" evidence standard can be met through "uncontroverted factual allegations" supported by "document and affidavit evidence."  <u>Valore v. Islamic Republic of Iran</u>, 700 F. Supp. 2d 52, 59 (D.D.C. 2010) (quotations omitted).  A court may also "take judicial notice of any fact 'not subject to reasonable dispute in that it is . . . capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned,'" including facts established in related proceedings and other court records.  <u>Id.</u> (quoting Fed. R. Evid. 201(b)).

As noted above, much of the same evidence that established Iran's liability in previous cases

will again serve as the basis for evaluating liability here.  See, e.g., Owens, 826 F. Supp. 2d at 151.

In addition, and as the Court has previously done, the Court will rely on the Special Master Reports

prepared based on sworn testimony and statements, medical records, and other documentary

evidence.  See Amduso v. Republic of Sudan, 61 F. Supp. 3d 42, 46 (D.D.C. 2014) (adopting "all

facts found by the special masters"), aff'd in part, vacated in part sub nom. Owens v. Republic of

Sudan, 864 F.3d 751 (D.C. Cir. 2017).

  To start, plaintiffs bring claims for economic loss and pain and suffering damages.  Because

acts of terrorism are "by their very definition" extreme and outrageous conduct, the Court has

previously determined that injuries to survivors of such acts are "compensable by analogy under the

tort of intentional infliction of emotional distress."  Mwila v. Islamic Republic of Iran, 33 F. Supp.

3d 36, 40 (D.D.C. 2014) (internal quotation marks omitted), aff'd in part sub nom. Owens v. Republic

of Sudan, 864 F.3d 751 (D.C. Cir. 2017).  "Hence, 'those who survived the attack may recover

damages for their pain and suffering . . .  [and for] economic losses caused by their injuries.'"  Id.

(quoting Oveissi II, 879 F. Supp. 2d at 55).  Here, several plaintiffs are surviving victims of the

August 7, 1998 U.S. Embassy bombings, see Sheikh/Chogo Mot. at 21–31; Lonnquist Mot. at 11–

13, and, accordingly, satisfy the elements of an intentional infliction of emotional distress claim.  See

Opati v. Republic of Sudan, 60 F. Supp. 3d 68, 76 (D.D.C. 2014); Baker v. Socialist People's Libya

Arab Jamahirya, 775 F. Supp. 2d 48, 74 (D.D.C. 2011) (allowing plaintiffs injured in a state-

sponsored terrorist bombing to recover compensatory damages, including pain and suffering, under

the tort of "intentional infliction of emotional distress"); Estate of Bland v. Islamic Republic of Iran,

831 F. Supp. 2d 150, 153 (D.D.C. 2011) (same).

  Next, the Court turns to the claims brought by victims' family members for solatium damages

resulting from Iran's intentional infliction of emotional distress.  See Sheikh/Chogo Mot. at 21–23,

27; Lonnquist Mot. at 13–17.  Under the Second Restatement of Torts, "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm."  Heiser v. Islamic Republic of Iran, 659 F. Supp. 2d 20, 26 (D.D.C. 2009) (quoting Restatement (2d) of Torts § 46(1)).  Recovery on an intentional infliction of emotional distress claim is generally limited by two further qualifications: "the plaintiff must be 'a member of [the injured person's] immediate family and must be 'present at the time.'"  Oveissi II, 879 F. Supp. 2d at 54 (quoting Restatement (2d) of Torts § 46(2)(a)–(b)).  In the case of terrorism, however, "[c]ourts have uniformly held that a terrorist attack—by its nature—is directed not only at the victims but also at the victims' families."  Salazar v. Islamic Republic of Iran, 370 F. Supp. 2d 105, 115 n.12 (D.D.C. 2005); see also Republic of Sudan v. Owens, 194 A.3d 38, 44 (D.C. 2018) (concluding that, under D.C. law, "when § 1605A applied, the need for the presence requirement does not").  Hence, if plaintiffs establish that they are members of the injured victim's immediate family, they need not independently satisfy the presence requirement.

All plaintiffs who are immediate family members of direct victims—the son of Francis Njuguna, the relatives of George Mimba, the relatives of Farhat Mahmood Sheikh, the relatives of Gary Lonnquist, the relatives of Timothy Teske, and John Doe—satisfy each of these elements.  First, as noted above, "[a]cts of terrorism 'by their very definition' amount to extreme and outrageous conduct," Wamai v. Republic of Sudan, 60 F. Supp. 3d 84, 90 (D.D.C. 2014) (quoting Valore, 700 F. Supp. 2d at 88), aff'd in part, vacated in part sub nom. Owens v. Republic of Sudan, 864 F.3d 751 (D.C. Cir. 2017), and the Court previously concluded that Iran purposely aided in the perpetration of these actions.

Second, each of the plaintiffs is a member of a victim's immediate family: John Kabi Kibe is

the son of Francis Njuguna, see Njuguna Report at 4; Priscilla Mimba, Judith Mimba, Christine

Mimba, Fredrick Mimba, Hesbon Mimba, Beatrice Mimba, Zablon Mimba, Edwin Mimba, and Erica

Mimba are the mother and siblings of George Mimba, see R. & R. of Special Master Deborah

Greenspan Regarding Damages Claims Asserted by Prisca Akumu Mimba, et al. ("Mimba Report")

[Chogo ECF No. 69] at 7–18; Nasrin Akhtar Sheikh, Farin Akhtar Safeer, Faraz Akhtar Sheikh, and

Faizan Akhtar Sheikh are the widow and children of Farhat Sheikh, see Sheikh Report at 7–15; Joan

Lonnquist is the wife of Gary Lonnquist, see Lonnquist Report at 6–7; Sharon Teske, Taylor Teske,

and the Estate of Ruth Midden are the wife, child, and mother of Timothy Teske, see id. at 10–16;

and John Doe is the son of an individual injured in the scope of his or her employment during the

Nairobi bombing, see Lonnquist Am. Compl. ¶ 9; Lonnquist Report at 12–14.   All of these

relationships easily fall within the definition of immediate family members.   See Murphy v. Islamic

Republic of Iran, 740 F. Supp. 2d 51, 75 (D.D.C. 2010) (including one's spouse, parents, siblings,

and children within "the strict meaning of immediate family" (internal quotation mark omitted)).

Finally, these plaintiffs have all suffered significantly from their loved ones' psychological,

emotional, and physical injuries.   See Sheikh/Chogo Mot. at 21–23, 27; Lonnquist Mot. at 13–17.

The Court thus concludes that Iran is liable to plaintiff family members for solatium damages

stemming from the injuries their loved ones suffered during the Embassy bombings.

## III.   Damages

Having established the Iranian defendants' liability under the FSIA for the August 7, 1998

bombing of the U.S. Embassy in Kenya, the Court now turns to the various forms of damages that

plaintiffs seek.   For the most part, the Court will adopt the recommendations provided in the Special

Masters' Reports, with a few adjustments as noted below.

A.  <u>Compensatory Damages</u>

"To obtain damages against a non-immune foreign state under the FSIA, a plaintiff must prove that the consequences of the foreign state's conduct were 'reasonably certain (i.e., more likely than not) to occur, and must prove the amount of damages by a reasonable estimate consistent with this [Circuit]'s application of the American rule on damages.'"  <u>Salazar</u>, 370 F. Supp. 2d at 115–16 (some internal quotation marks omitted).  As in previous cases arising from the 1998 bombings, "[p]laintiffs here have proven that the consequences of defendants' conduct were reasonably certain to—and indeed intended to—cause injury to" those victims immediately implicated in the attacks. <u>Wamai</u>, 60 F. Supp. 3d at 89; <u>see also</u> <u>Ewan v. Islamic Republic of Iran</u>, Civil Action No. 17-1628 (JDB), 2020 WL 3081939, at *6 (D.D.C. June 10, 2020).  Likewise, the immediate family members of those direct victims have also demonstrated that they are "entitled to solatium damages" to compensate them for the pain and suffering caused by the purposeful injury of their relative.  <u>Wamai</u>, 60 F. Supp. 3d at 90.

1.  *Economic damages*

Under the FSIA, injured victims and the estates of deceased victims may recover economic damages, which typically include lost wages, benefits and retirement pay, and other out-of-pocket expenses.  28 U.S.C. § 1605A(c); <u>Lelchook v. Syrian Arab Republic</u>, Civil Action No. 16-1500 (RC), 2019 WL 4673849, at *3 (D.D.C. Sept. 25, 2019).  Both the <u>Sheikh</u> and <u>Chogo</u> plaintiffs request economic damages in their complaints without much elaboration, <u>see</u> <u>Sheikh</u> Compl. ¶ 100; <u>Chogo</u> Compl. ¶ 175, but plaintiffs' motions for default judgment more specifically request economic damages be awarded to the Estate of Francis Kibe Njuguna and the Estate of Akhtar Sheikh in the amounts recommended by the Special Masters.  <u>Sheikh</u>/<u>Chogo</u> Mot. at 16; <u>see also</u> Njuguna Report at 6–7; Sheikh Report at 6–7.  To determine plaintiffs' economic losses resulting from the bombings,

14

the Special Masters relied on an economic report submitted by Chad Staller and Stephen Dripps of the Center for Forensic Economic Studies ("CFES"), who estimated lost earnings.  In turn, CFES relied on information from the documents provided to the Court and Special Masters in this case, as well as objective actuarial and economic data from the World Health Organization, the U.S. Department of Labor, the Congressional Budget Office, and the official site for the Kenyan Central Bank.  See Njuguna Report at 6–7 (explaining the methodology employed in creating the economic loss reports); Sheikh Report at 6–7 (same).  The Court adopts the findings and recommendations of the Special Masters as to economic losses to be awarded to both estates, and thus awards $137,305 to Njuguna's estate and $302,002 to Sheikh's estate.[1]

   2.  *Awards for Pain and Suffering Due to Injury*

   Pain and suffering awards for surviving victims are determined based on factors including "the severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life."  See O'Brien v. Islamic Republic of Iran, 853 F. Supp. 2d 44, 46 (D.D.C. 2012), abrogated on other grounds, Barry v. Islamic Republic of Iran, 410 F. Supp. 3d 161 (D.D.C. 2019).  In calculating the damages amount, "the Court must take pains to ensure that individuals with similar injuries receive similar awards." Wamai, 60 F. Supp. 3d at 91 (quoting Peterson v. Islamic Republic of Iran ("Peterson II"), 515 F. Supp. 2d 25, 54 (D.D.C. 2007)).

   In light of the need for uniformity, judges in this district have developed a general framework for assessing pain and suffering damages for direct victims of terrorist attacks, awarding a baseline

---

   [1] The CFES economic reports include both the total economic losses suffered by plaintiffs and CFES's calculations for the appropriate prejudgment interest on those loss figures.  See Njuguna Report at 6; Sheikh Report at 6–7.  Because the Court will perform its own prejudgment interest calculations, it will rely on the CFES's economic loss figures before prejudgment interest.

of $5 million to individuals suffering severe physical injuries, such as compound fractures, serious flesh wounds, and scars from shrapnel, as well as lasting and severe psychological pain.  See, e.g., Wamai, 60 F. Supp. 3d at 91; Peterson II, 515 F. Supp. 2d at 51–54.  Where physical and psychological pain is more dire—such as where victims suffered relatively more numerous and severe injuries, were rendered quadriplegic, partially lost vision and hearing, or were mistaken for dead—courts have departed upward from this baseline to $7 million and above.  See O'Brien, 853 F. Supp. 2d at 47.  At the other end of the spectrum, downward departures to a range of $1.5 to $3 million are warranted where the victim suffers severe emotional injury accompanied by relatively minor or no physical injuries.  See Valore, 700 F. Supp. 2d at 84–85.  And, in either case, compensation is available for injuries and trauma sustained both directly in the attack and in the "recovery efforts immediately thereafter."  Wamai, 60 F. Supp. 3d at 92; see also Opati, 60 F. Supp. 3d at 78 (awarding an enhanced award of $7.5 million for pain and suffering to a first responder who contracted HIV through exposure to victims' blood via "cuts and scratches" that he suffered "[w]hile digging through the rubble").

The Special Masters in Sheikh and Chogo recommend awards ranging from $1.5 to $2.5 million for direct victims in this case, with one recommendation of $7.5 million for an exceptional case.  See Report to Special Masters Regarding Plaintiff Taitoro Masanga Omwanda's Claims ("Omwanda Report") [Chogo ECF No. 53] at 7–8.  The Special Master in Lonnquist recommends awards of $5 million in pain and suffering for each direct victim.  See Lonnquist Report at 26.  The Court will adopt the recommendations with a few adjustments.

To begin, plaintiffs William Kibiy Kili and Richard Maweu passed away during the pendency of this litigation.  See Report and Recommendations of Special Master Ann Kough Regarding Claims of William Kibiy Kili ("Kili Report") [Chogo ECF No. 84] (regarding Kili's death in 2017); Report

16

and Recommendations of Special Master Ann Kough Regarding Claims of Richard Maweu ("Maweu Report") [Chogo ECF No. 91] (regarding Maweu's death in 2018).   The Special Master recommended awards of $2 million and $1.5 million to Kili and Maweu, respectively.   See Kili Report at 6–7; Maweu Report at 7.   Due to plaintiffs' deaths, their counsel moved to substitute in the Estate of Willian Kibiy Kili and the Estate of Richard Maweu as parties in this action.   See Mot. to Substitute Party [Chogo ECF No. 98] (regarding Kili); Mot. to Substitute Party [Chogo ECF No. 99] (regarding Maweu).   The Court grants both motions to substitute and now adopts the recommendations of the Special Master awarding $2 million to the Estate of Willian Kibiy Kili and $1.5 million to the Estate of Richard Maweu.

Next, Special Master Stephen A. Saltzburg recommended a $7.5 million pain and suffering award for plaintiff Taitoro Masanga Omwanda.   See Omwanda Report at 7–8.   Although Omwanda's injuries were initially minor cuts and scrapes, he suffered from a stroke shortly after the bombing, and contracted HIV/AIDS as a result of contact with the blood of other victims in his rescue efforts. See id.; see also Medical Records of Taitoro Masanga Omwanda [Chogo ECF No. 103-3].   In Opati v. Republic of Sudan, the Court awarded $7,500,000 each to two plaintiffs who suffered minor cuts while pulling victims from the Nairobi embassy bomb site, but later tested positive for HIV.   60 F. Supp. 3d at 78–79 ("Although [plaintiffs] otherwise suffered only minor physical injuries during the recovery efforts, HIV is a chronic, serious, and stigmatizing disease requiring a lifetime of treatment. [Plaintiffs'] injuries are comparable to those plaintiffs awarded $7–$8 million in Peterson II, and the Court will award them $7.5 million for pain and suffering.").   Therefore, although this award is considerably greater than those awarded to other plaintiffs in this action, the Court finds it the appropriate compensation given the considerable consequences of the attack for Omwanda's long-term health.

Finally, the Court agrees with Special Master Ann Kough that no award can be made to Duncan Mutia Musyoka or his estate.  Musyoka died during the pendency of this action, but counsel "have been unable to verify that an estate has been opened" on his behalf.  See Report and Recommendations of Special Master Ann Kough Regarding Claims of Duncan Mutia Musyoka ("Musyoka Report") [Chogo ECF No. 87] at 2.  Without such documentation, the Court cannot award pain and suffering damages and, therefore, dismisses Musyoka's claim without prejudice.

3.  *Awards for Pain and Suffering Prior to Death*

Damages for extreme pain and suffering are warranted for those individuals who initially survive the attack but then succumb to their injuries.  "When the victim endured extreme pain and suffering for a period of several hours or less, courts in these [terrorism] cases have rather uniformly awarded $1 million."  Haim v. Islamic Republic of Iran, 425 F. Supp. 2d 56, 71 (D.D.C. 2006).  When the period of the victim's pain is longer, the award increases.  Id. at 72.  And when the period is particularly brief, courts award less.  For instance, where an individual "survived a terrorist attack for 15 minutes, and was in conscious pain for 10 minutes," one judge in this District awarded $500,000.  See Peterson II, 515 F. Supp. 2d at 53.

Special Master Carlos Moreno recommended a $500,000 pain and suffering award for Francis Njuguna, who died as a result of the attack.  See Njuguna Report at 8–9.  In pre-death suffering cases, "the key factual dispute turns on whether the [victims] were immediately rendered unconscious."  Oldham v. Korean Air Lines Co., 127 F.3d 43, 56 (D.C. Cir. 1997).  Here, the Special Master found that the evidence demonstrated that Njuguna's cause of death was "fire exposure" and that he likely "suffered intense and excruciating pain for at least a short period of time before his death."  Njuguna Report at 8; cf. Estate of Doe v. Islamic Republic of Iran ("Doe II"), 943 F. Supp. 2d 180, 189 (D.D.C. 2013) (denying pre-death pain and suffering damages where the victim died as a result of debris

18

falling on his head, "killing him instantly"). Njuguna's suffering appears similar to that of plaintiffs in Wamai, who were awarded an additional $500,000 for pain and suffering. See Wamai, 60 F. Supp. 3d at 91. Therefore, the Court adopts the recommendation of the Special Master.

4. *Solatium*

Next, the Court turns to several family members' claims for solatium damages. Damages for solatium "are by their very nature unquantifiable." Moradi v. Islamic Republic of Iran, 77 F. Supp. 3d 57, 72 (D.D.C. 2015). To bring some uniformity to these cases, however, the Court directed the Special Masters to evaluate plaintiffs' damages claims using relevant precedent. See Order Adopting Administrative Plan [Chogo ECF No. 37] 6–7. Judges in this District have established two primary frameworks, sometimes called the "Peterson II" or "Heiser" frameworks, for evaluating solatium damages for terrorist victims and their family members. See Murphy, 740 F. Supp. 2d at 78–79. Under both the Peterson II and Heiser frameworks, the standard damages awards for the immediate family members of a deceased victim are $5 million for parents, $2.5 million for siblings, $8 million for spouses, and $5 million for children. See Mwila, 33 F. Supp. 3d at 44–45 (citing Peterson II, 515 F. Supp. 2d at 51–53); Davis v. Islamic Republic of Iran, 882 F. Supp. 2d 7, 14 (D.D.C. 2012). Those awards are typically halved for family members of an injured victim. See Mwila, 33 F. Supp. 3d at 44–45. But courts have also been mindful not to award family members a greater solatium award than the award received by individuals directly injured in the attacks. See Estate of Brown v. Islamic Republic of Iran, 872 F. Supp. 2d 37, 42 (D.D.C. 2012). To avoid doing so, judges in this District have reduced the family members' awards "in rough proportion" to the directly affected victims' awards. See Davis, 882 F. Supp. 2d at 15–16. Accordingly, the Court adopts the recommendations of the Special Masters with the following adjustments.

First, the Special Master in Njuguna's case recommended a solatium award of $5.5 million

for Francis Njuguna's son, John Kabi Kibe, a $500,000 enhancement over the Peterson II baseline. See Njuguna Report at 9. In general, factors that recommend the awarding of an enhancement include "evidence establishing an especially close relationship between the plaintiff and decedent . . . ; medical proof of severe pain, grief or suffering on behalf of the claimant; and circumstances surrounding the terrorist attack which made the suffering particularly more acute or agonizing." Braun v. Islamic Republic of Iran, 228 F. Supp. 3d 64, 85 (D.D.C. 2017) (internal quotation omitted). Ultimately, however, the decision whether to "deviate from the starting points provided by the [Peterson II] framework [is] committed to the discretion of the particular court in each case." Id. (internal quotation omitted).

Here, the Special Master describes John Kabi Kibe as "endur[ing] the additional trauma of inspecting bodies and body parts of other victims for two days" while searching for his father's body. Njuguna Report at 9. After his father's death, John also "had to put aside his plans to attend university to obtain a bachelor's degree . . . [and] to give up his dreams to care for his family and run the family farm." Id. John cared for his sick mother and his brother, who had begun suffering from alcoholism after their father's death. Id. Considering the severe negative consequences in John's own life, and comparing those to the other accounts depicted in the Special Masters' reports, see, e.g., Sheikh Report at 10–14 (awarding the baseline amount where children of the deceased victim did not see their loved one's body or abandon their career plans to provide for their family), the Court concludes that this enhancement is appropriate, and will award John Kabi Kibe $5.5 million. Cf. Kinyua, 2020 WL 2542119, at *6 (adopting an award enhancement where plaintiff suffered "severe negative consequences," including losing his job).

Regarding the Lonnquist plaintiffs, Special Master Deborah Greenspan recommended a baseline solatium award of $4 million to each victim's spouse, an award of $2.5 million to Timothy

20

Teske's son Taylor, and a reduced award of $1.25 million to the Estate of Ruth Midden, Timothy Teske's mother.  See Lonnquist Report at 26.  Although the award of $2.5 million to Teske's son is above the recommendation of some courts, see Akins v. Islamic Republic of Iran, 332 F. Supp. 3d 1, 43 (D.D.C. 2018); Spencer v. Islamic Republic of Iran, 71 F. Supp. 3d 23, 28 (D.D.C. 2014), the Special Master followed the conclusion of other courts that children of injured victims receive $2.5 million.  See Owens v. Republic of Sudan, 71 F. Supp. 3d 252, 260 (D.D.C. 2014); Amduso, 61 F. Supp. 3d at 50; Onsongo v. Republic of Sudan, 60 F. Supp. 3d 144, 151 (D.D.C. 2014).  The Court agrees with the latter approach, as recommended by Special Master Greenspan, because "children who lose parents are likely to suffer as much as parents who lose children."  Mwila, 33 F. Supp. 3d at 45.  Here, Teske's son lived in Nairobi at the time of the attack and suffered "severe emotional difficulties" and "significant changes in the family dynamic."  See Lonnquist Report at 24.  The Court therefore finds this award, which is consistent with precedent, to be reasonable and adopts the recommendation of the Special Master.  And the Court likewise concludes that John Doe, also the son of a direct victim of the Nairobi bombing, similarly qualifies for an award of $2.5 million.  See id. at 13–14, 23–24.

The recommended solatium award of $1.25 million to the Estate of Ruth Midden, however, presents additional challenges.  While she was Teske's mother and, as such, qualifies as an immediate family member for whom there is a "presumption" of emotional injury, see Kaplan v. Hezbollah, 213 F. Supp. 3d 27, 38 (D.D.C. 2016), the evidence examined by Special Master Greenspan provides no information about the effect of the bombing on Midden.  See Lonnquist Report at 15.  While Teske believes that the news of the bombing caused Midden's subsequent heart attack and death, there is no medical evidence to support this conclusion.  Id.  Courts have declined to award solatium damages where the record does not provide testimony demonstrating that the plaintiff suffered anguish over

21

the injuries of the victim.  See Roth v. Islamic Republic of Iran, 78 F. Supp. 3d 379, 405–06 (D.D.C.

2015) (denying award where no evidence showed injury that an award of solatium damages might

compensate); Wamai, 60 F. Supp. 3d at 96 (adopting recommendation that no solatium damages be

awarded where record does not contain sufficient evidence to support claims).  Previous opinions of

this Court are consistent with this principle.  See, e.g., Mwila, 33 F. Supp. 3d at 46 (declining to

award solatium damages where "the record does not contain sufficient evidence to support the award

of any damages").  Accordingly, the Court is unable to conclude on this record that Midden was

aware of or "suffered any anguish over the hardships endured by her [son]," Kaplan, 213 F. Supp. 3d

at 39, declines to adopt the recommendation of the Special Master, and will not award solatium

damages to the Estate of Ruth Midden.

*      *      *

In sum, the Court will award $153,939,307.00 in compensatory damages as detailed in

Schedule A of the accompanying Order to be issued on this date.

B.  Punitive Damages

In addition to compensation for the emotional distress caused by the terrorist attack, plaintiffs

also seek punitive damages.  See Sheikh Compl. at 29; Chogo Compl. at 46–7; Lonnquist Compl. at

22.  Punitive damages "serve to punish and deter the actions for which they [are] awarded."  Valore,

700 F. Supp. 2d at 87.  The D.C. Circuit has previously concluded that "a plaintiff proceeding under

either state or federal law cannot recover punitive damages for conduct occurring prior to the

enactment of § 1605A [in 2008]," Owens, 864 F.3d at 818, but the Supreme Court vacated that ruling

in May of this year, concluding "that punitive damages are permissible for federal claims" under

§ 1605A(c), Opati v. Republic of Sudan, 140 S. Ct. 1601, 1610 (2020).  As noted above, several

plaintiffs bring their claims under the federal cause of action in § 1605A(c) and in light of the

22

Supreme Court's holding in Opati, the Court concludes those plaintiffs are eligible for punitive damages against Iran.

Courts calculate the appropriate amount of punitive damages by weighing four factors: "(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." Oveissi II, 879 F. Supp. 2d at 56 (quoting Acosta v. Islamic Republic of Iran, 574 F. Supp. 2d 15, 30 (D.D.C. 2008)). Here, all factors weigh in favor of awarding significant damages: Iran aided al Qaeda in carrying out a horrific attack that killed hundreds of people and injured thousand more; plaintiffs suffered severe psychological trauma as a result; there is a significant need to deter further such terrorist attacks; and defendant is a sovereign nation that can be presumed to possess significant wealth.

Even with these factors as guidelines, courts in this District have varied in how they award punitive damages. In Doe, this Court awarded $300 million based on the determination that "Iran's material support to Hezbollah['s attack on the U.S. Embassy in Beirut, Lebanon,] in the relevant time period was between $50 and $150 million . . . , and that an award of three times that amount is necessary to deter Iran from such conduct." Doe II, 943 F. Supp. 2d at 189–90. Other courts have based awards of punitive damages on the underlying compensatory damages. See Fritz v. Islamic Republic of Iran, 324 F. Supp. 3d 54, 65 (D.D.C. 2018) ("Recently, several decisions from this [District] have calculated the total compensatory damages awarded regarding a victim, and then multiplied that award 'by a factor between one and five.'"). This question becomes doubly complicated when trying to assess the proper award of punitive damages in a case subsequent to others that already imposed punitive damages for the same incident. See Murphy, 740 F. Supp. 2d at 81–82. As this Court noted in Doe II, it must be cautious of imposing further punitive damages

23

when they have previously been awarded not just by this Court, but also by others in this District. See, e.g., Doe II, 943 F. Supp. 2d at 190 (regarding the 1984 bombing in Beirut).

Given these complications and the inability to employ the "expenditure-times-multiplier method" to the 1998 embassy bombings, this Court has previously found it appropriate "to award punitive damages in an amount equal to the total compensatory damages awarded in this case." Opati, 60 F. Supp. 3d at 82.  This approach has the virtue of straightforwardly scaling as additional sets of plaintiffs come forward—punitive damages will continue to grow as the full scope of the harm done by Iran's material support of the bombings becomes evident—and is both "consistent with the punitive damage awards in analogous cases" and a forceful deterrent against Iran's further support of terrorist organizations.  Id.[2]  To that end, the Court will award punitive damages in the amount of $112,939,307.00 to those plaintiffs pursuing their claims under § 1605A(c).

As for those plaintiffs bringing claims under D.C. common law, the Court is mindful that the Supreme Court did not reach the question of whether punitive damages are available for claims proceeding under state law, but instead left that question to the D.C. Circuit to "reconsider."  Opati, 140 S. Ct. at 1610.  The D.C. Circuit is still in the process of reexamining that question, see Order, Opati v. Republic of Sudan, No. 14-7124 (D.C. Cir. July 27, 2020), and this Court is loath to weigh in before receiving the D.C. Circuit's guidance.  Still, rather than require all plaintiffs in these case to wait on that forthcoming decision, the Court will "direct entry of a final judgment as to" all claims but those for punitive damages raised by plaintiffs proceeding under causes of action other than § 1605A(c).  See Fed. R. Civ. P. 54(b).  Although this piecemeal approach may raise fairness

---

[2] This approach also aligns with that taken by the Court recently in Ewan, where the Court strove to maintain the "same ratio" of punitive to compensatory damages across various judgments arising from the same Iran-backed terrorist attack.  See Ewan, 2020 WL 3081939, at *11.

concerns in a contested proceeding, where a defendant might face staggered appeals or the like, Iran's absence from these proceedings eliminates such concerns. And given that eligibility for one of the main avenues for plaintiffs' compensation, the U.S. Victims of State Sponsored Terrorism Fund, requires a final judgment on plaintiffs' compensatory claims, see Frequently Asked Questions, U.S. Victims of States Sponsored Terrorism Fund, http://www.usvsst.com/faq.php (last accessed on August 31, 2020) (noting that, as relevant here, "a final judgment" is required to apply for an award), the Court finds that final judgment on some, but not all, claims is the best course and "that there is no just reason for delay," Fed. R. Civ. P. 54(b).

C. Prejudgment Interest

All three sets of plaintiffs seek prejudgment interest. See Sheikh Compl. at 31; Chogo Compl. at 48; Lonnquist Am. Compl. at 23. "Whether to award such interest is a question that rests within this Court's discretion, subject to equitable considerations." Oveissi II, 879 F. Supp. 2d at 58. This Court has previously awarded prejudgment interest on similarly situated plaintiffs' awards, including pain and suffering and solatium, Opati, 60 F. Supp. 3d at 82; other courts, however, have concluded that awards following the so-called Peterson II framework, as these do, already "represent the appropriate level of compensation, regardless of the timing of the attack." See Brown, 872 F. Supp. 2d at 45; Oveissi v. Islamic Republic of Iran ("Oveissi I"), 768 F. Supp. 2d 16, 30 n.12 (D.D.C. 2011); see also Oveissi II, 879 F. Supp. 2d at 59 (gathering cases wherein prejudgment interest was denied). Nevertheless, this Court will follow its general practice. As the Court observed recently, "plaintiffs are entitled to the full amount of their award as if they received it at the time of the injury," and failure to award prejudgment interest would "allow the Iranian defendants to profit from the use of the money over the last [two] decades." Ewan, 2020 WL 3081939, at *9 (internal quotation marks omitted).

An award of prejudgment interest at the prime rate is thus appropriate in this case.  See Oldham, 127 F.3d at 54; Forman v. Korean Air Lines Co., 84 F.3d 446, 450–51 (D.C. Cir. 1996).  Prejudgment interest will be applied to the whole award of compensatory damages, including damages for economic loss, pain and suffering, and solatium.  See Reed, 845 F. Supp. 2d at 214–15 (awarding prejudgment interest on the full award); but see Oveissi I, 768 F. Supp. 2d at 30 n.12 (declining to award prejudgment interest on solatium damages).  The Court will calculate the applicable interest using the prime rate for each year.  The D.C. Circuit has explained that the prime rate—the rate banks charge for short-term unsecured loans to creditworthy customers—is the most appropriate measure of prejudgment interest, one "more appropriate" than more conservative measures such as the Treasury Bill rate, which represents the return on a risk-free loan.  See Forman, 84 F.3d at 450.  Although the prime rate, applied over a period of several years, can be measured in different ways, the D.C. Circuit has approved an award of prejudgment interest "at the prime rate for each year between the accident and the entry of the judgment."  See id.  Using the prime rate for each year is more precise than, for example, using the average rate over the entire period.  See Doe II, 943 F. Supp. 2d at 185 (noting that this method is a "substantially more accurate 'market-based estimate'" of the time value of money (citing Forman, 84 F.3d at 451)).  Moreover, calculating interest based on the prime rate for each year is a straightforward matter, and using the prime rate for each year since the bombings results in a multiplier of 2.9501 for damages incurred on August 7, 1998.[3]

---

[3] Specifically, the Court calculated this multiplier using the Federal Reserve's data for the average annual prime rate in each year from 1998 to 2020.  See Bd. of Governors of the Fed. Reserve Sys., Data Download Program, available at https://www.federalreserve.gov/datadownload/ (last visited August 28, 2020).  To calculate the multiplier, the Court multiplied $1.00 by the prime rate in 1998 (8.35%); discounted that interest by the percentage of the year left from August 7, 1998, to December 31, 1998 (40.0%); and then added that amount to $1.00, yielding $1.0334.  Then, the Court took that amount and multiplied it by the prime rate in 1999 (8.00%) and added that amount to $1.0334, yielding $1.1161.  Continuing this iterative process through August 31, 2020, yields a multiplier of 2.9501.  See Opati, 60 F. Supp. 3d at 83 n.10.  For 2020, the Court estimated the rate to be 4.052%—the average for the past six years—and again discounted the interest by the percentage of the year that has elapsed to date (66.67%).  See id. at 83 n.11.

Accordingly, the Court will use this multiplier to calculate the total interest award.

     D.  <u>Attorney's Fees & Costs</u>

Finally, the complaints in <u>Sheikh</u> and <u>Chogo</u> passingly request "[c]osts and expenses" and "[a]ttorney's fees." <u>See</u> <u>Sheikh</u> Compl. at 31; <u>Chogo</u> Compl. at 49 (requesting costs). Both sets of plaintiffs appear to abandon these requests in their motions for default judgment, however, and have not "provided any information regarding the fees and costs sought." <u>Aceto</u>, 2020 WL 619925, at *23. The Court will thus deny the <u>Sheikh</u> and <u>Chogo</u> plaintiffs' requests for attorney's fees and costs.

## Conclusion

For the foregoing reasons, the Court concludes that the <u>Sheikh</u>, <u>Chogo</u>, and <u>Lonnquist</u> plaintiffs have—with few exceptions—demonstrated a severe loss as a result of Iran's deliberate and extreme conduct. Because the evidence in the record and the Court's prior decisions sufficiently support the allegations in their complaints, judgment will be entered for plaintiffs on their various claims, with the exception of those claims for punitive damages under causes of action other than § 1605A(c). The Court will award compensatory damages totaling, with prejudgment interest, $454,136,349.58. The Court will also award punitive damages of $112,939,307.00. A separate order specifying each plaintiff's award will be issued on this date.

/s/<br>
JOHN D. BATES<br>
United States District Judge

Dated:  <u>August 31, 2020</u>